Filed 7/29/16  P. v. Maldonado CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>REYNALDO MALDONADO,<br><br>  Defendant and Appellant. | A141242<br><br>(San Mateo County<br>Super. Ct. No. SC065313A) |

Defendant and appellant Reynaldo Maldonado appeals from the trial court's judgment following a jury verdict finding him guilty of first degree murder.  His principal contention on appeal is that the court erred in excluding defense expert testimony regarding his intellectual disabilities.  We affirm.

PROCEDURAL BACKGROUND

In January 2008, the San Mateo County District Attorney charged appellant with first degree murder and alleged a lying-in-wait special circumstance.  (Pen. Code §§ 187, subd. (a), 190.2, subd. (a)(15).)[1]  In November 2013, a jury found appellant guilty of first degree murder but found the lying-in-wait allegation not true.  The trial court sentenced appellant to an indeterminate term of 25 years to life.  This appeal followed.

---

[1] All undesignated statutory references are to the Penal Code.

1

FACTUAL BACKGROUND

The Murder and Initial Police Investigation

Appellant and Erick Morales were childhood friends from Guatemala who, in May 2001, were living with Morales's father in Daly City. At the time, appellant was 22 years old and not in school. Morales was 19 years old and a freshman at Westmoor High School in Daly City. The victim, Quetzalcoatl Alba, was also a freshman at Westmoor.

Morales, Alba, and several other youths (including Julio Sevilla, Jonathan Barcia, Darwin Gutierrez, David Rementeria, and Victor Rey) would hang out in a storage locker at an apartment complex. The youths had put in a couch, mattresses, and a television. The locker was secured by a combination padlock; the victim and others knew the combination.

On the morning of May 21, 2001, Barcia saw Morales and Alba walking away from the high school shortly after 10 a.m. That afternoon, at around 3:30 p.m., Barcia and several other youths found Alba's dead body in the storage locker. An autopsy revealed that Alba died from multiple stab wounds to the chest and neck.

About a week later, on May 29, 2001, appellant called 911 from a pay phone. He reported that he saw the stabbing on May 21, it occurred at about 10 a.m., and he took photographs of the killer. Appellant refused to give his name, claiming he had been threatened. He said the killer was from Guatemala and about 18 years old, and both the killer and the victim were students at a school called "Richmond." He said the suspect was thin with curly hair and then hung up the phone. Police were dispatched to the location of the call and saw appellant on the phone; appellant told him a woman had been on the phone before him.

On June 1, 2001, appellant was interviewed by a police detective. Appellant said he was living with Morales and Morales's father. Appellant said he went to a shopping center on May 21 to take photographs and he saw a Black man with blood on his chest. The man snatched appellant's camera and ran away. Appellant thought the man who stole the camera may have been the person who killed Alba. Appellant said he saw

2

Morales at around 7 a.m. and then around 4 p.m. on May 21. He admitted making the 911 call, but the detective had not listened to the call at the time of the interview.[2]

Appellant gave a similar account in a second police interview on June 6, 2001. Subsequently, the police were unable to locate appellant. A co-worker testified she lent appellant money and took him to a Greyhound station in early June. The police were also unable to locate Morales, after an initial interview a couple days after the murder. Morales was arrested in 2009 in New York.

Testimony From Appellant's Florida Acquaintances and the Arrest of Appellant

The prosecution presented testimony from two witnesses who said they knew appellant in Miami, Florida.

Mario Cajina testified he lived in the same trailer park as appellant in Miami; appellant arrived in mid to late 2001. Sometime in around 2005, after Cajina and appellant had both moved away from the trailer park, appellant called Cajina around midnight, crying and upset. Cajina went to go see appellant, and appellant told Cajina he was feeling guilty because he and another person had killed a young man in California in 2001. The other person was a male friend with whom appellant lived. It was the friend's idea to commit the murder; appellant reported his friend said, "we're going to kill this guy." They invited the victim to ditch school and go to an abandoned home, where appellant's friend told the victim, "This is where I wanted you." Appellant's friend and the victim started struggling, and the victim was prevailing. At that point, appellant grabbed the victim, and his friend stabbed the victim until he was dead. Appellant said he had seen the knife before he grabbed the victim, and he grabbed the victim to overcome the victim's resistance. Appellant showed Cajina a picture he had taken of his friend with the victim's body. After the killing, appellant and his friend buried their bloody clothes and the knife in the yard where they lived.

Cajina told the police in Miami what appellant had told him, but they did not take any action because he did not know appellant's last name or the location the killing.

---

[2] It appears the detectives who interviewed appellant in 2001 were unaware he had described the killer in the 911 call as a young Guatemalan male.

3

Subsequently, Cajina found out that information and the Miami police put him in touch with the Daly City police; this was about two years after appellant told Cajina about the murder.  Cajina asked for reward money and received $1,500, in addition to other limited financial assistance.  Cajina admitted that in 2009 he pleaded no contest to grand theft over $100,000 and completed a term of probation.

Another witness, Ondina Palma, testified she met appellant in Miami in June 2001 when he came to live with his uncle in a bedroom rented from Palma in a trailer park.  He remained for a year and a half.  After she had known him for about four months, appellant told her he had killed someone in California.  He explained he invited the victim to go drinking, drugged him, lured him to an empty apartment, and stabbed him.  Appellant said he did the stabbing and a friend from Honduras or Guatemala helped him.  Appellant told her the victim had made fun of appellant by calling him "faggot."  Appellant said he buried his bloody clothing and knife in his backyard.  He also said he took a photograph of the victim after the murder.

Palma did not inform the police of appellant's disclosure because at first she did not believe appellant and she also feared he would hurt her.  In 2007, after Cajina had made his report to the police, she told Cajina about what appellant told her and subsequently the police contacted her.  Palma's witness expenses, such as travel and lodging, were covered by the police, but she did not receive reward money.

After the Daly City police learned of what appellant said to Cajina they went to appellant's former residence and found a canister buried in the yard.  Inside the canister were a sweatshirt, a knife, and a cell phone.

Appellant was arrested in Miami in 2007.  The police found in his residence a photo album with the photo of Morales with Alba's dead body that appellant had shown to Cajina.  Appellant was brought back to California.  He ran away as he was being prepared for placement in a police car, but he fell from a height and was apprehended.

Appellant's Testimony

Appellant testified on his own behalf.  He denied he killed Alba or assisted Morales in the killing.

4

Appellant is about two years older than Morales. They were childhood friends in a small and remote Guatemalan village. Their relationship became sexual when appellant was 11 years old, but they kept it secret. Appellant loved Morales and considered him to be his boyfriend. Morales moved to the United States when appellant was about 18 years old, and appellant came six or seven months later, about six months before Alba's murder. About three months before the killing, appellant moved in with Morales, his father, and other relatives in Daly City. They continued their intimate relationship in secret. Appellant had completed sixth grade in Guatemala when he was 17 years old, and in California he worked at three jobs and did not attend school.

Morales called appellant on the morning Alba was murdered. Morales, who sounded nervous, told appellant to take a taxi to an address Morales provided. Appellant did so. After appellant exited the taxi, he saw Morales and saw that Morales had blood on his face. Morales took him to a small room nearby, and appellant saw a young man dead on the floor. Appellant had never seen the man before. Appellant photographed Morales with the body; he intended to use the photo to blackmail Morales into breaking up with his girlfriend.

Appellant went to buy Morales a new sweater. When appellant returned, Morales gave him the sweater Morales was wearing, a cell phone appellant did not recognize, and a knife that was wrapped up. Appellant put the items in a can and buried them in the backyard of their residence.

Eight days later, appellant called 911 to report the murder. But when police arrived at the pay phone, appellant decided not to turn in Morales because he loved him. Appellant left Daly City three days after his June 6 police interview; Morales had left two or three days before. Appellant testified he left because Morales's father threatened him.

Appellant denied he told Ondina Palma about the killing. He acknowledged he told Mario Cajina about it, but "not the way [Cajina] said it" at trial. Appellant said he lied when he told the 911 dispatcher he had seen the murder, and he admitted lying to the

police at the time of his 911 call, his June 2001 interviews, and his post-arrest police interview.[3]

## DISCUSSION

I.    *The Trial Court Did Not Abuse Its Discretion In Excluding Expert Testimony*

Appellant's primary contention on appeal is that the trial court "committed reversible error when it precluded the defense from presenting expert testimony about appellant's brain impairment and cognitive deficits to negate intent to kill, premeditation, and deliberation, and to help the jury evaluate the credibility of appellant's out-of-court statements and his trial testimony." (Capitalization omitted.) We reject the claim.

A.    *Factual Background*

Appellant retained a neurologist, a neuropsychologist, and a psychologist to evaluate him based on indications he had intellectual disabilities stemming from brain injuries. Respondent moved to exclude any expert testimony supporting a diminished capacity defense and requested a hearing to determine the relevance of the proffered testimony. In a motion in limine, appellant set forth the three expert evaluations and the grounds for relevance.

Dr. Jeffrey Kline, a psychologist, reviewed case files and conducted neuropsychological tests on appellant. Dr. Kline opined that appellant functioned in the "mildly mentally retarded range"; had moderately severe deficits in visual perception, visual-spatial memory, nonverbal problem solving, and cognitive processing speed; and was developmentally disabled. Dr. Kline reported similar findings at an admissibility hearing (Evid. Code § 402, subd. (b)), and opined that a person with such "neurocognitive deficits" could have impaired judgment in choosing social relations, difficulty extricating oneself from situations, vulnerability to being manipulated, impaired interpretation of social cues, difficulty learning new things, difficulty

---

[3] Appellant was also confronted with phone records that the prosecution used to try to undermine his testimony. We need not and do not summarize the phone records evidence and related testimony.

anticipating the consequences of behavior, immaturity in social interactions, concrete rather than abstract thinking, and impulsive decision-making.

Dr. Robert Perez, a neuropsychologist, obtained appellant's psychiatric and neuropsychological history and administered tests. Dr. Perez concluded appellant displayed slowed processing speed, impairment in his general intellectual ability, some impairment in attention and concentration, and difficulty in encoding and retrieving information. At a pretrial hearing, Dr. Perez reported appellant had "exceedingly poor performance" on intelligence tests of vocabulary, abstract verbal reasoning, and working memory. Dr. Perez opined appellant was impaired in reasoning, judging, thinking, and holding information. He also opined that a person with appellant's test results would be relatively more suggestible, less able to control his emotions, and more likely to become dependent on others.

Dr. Peter Cassini, a neurologist, conducted a neurological examination and analyzed the results of an MRI of appellant's brain. Dr. Cassini opined appellant has brain damage resulting from a congenital or developmental defect, or childhood head injuries reported by appellant; the brain damage did not result from the fall during appellant's airport escape attempt after his arrest. At a hearing, Dr. Cassini explained that the MRI images showed abnormal asymmetry in the spaces of fluid in appellant's brain. He said the cognitive deficits observed by Dr. Kline and Dr. Perez were consistent with the brain impairment he observed on the MRI images.

Appellant argued the expert testimony about his mental deficits would be relevant regarding malice, intent, deliberation, premeditation, and lying-in-wait ("diminished actuality" rather than "diminished capacity"); the intent and knowledge required for liability as an aider and abettor; the evaluation of the statements he made to officers and to persons he knew in Miami; and the credibility of his anticipated trial testimony. Appellant emphasized that the expert testimony would not be offered to prove he had a diminished capacity, but instead to raise a reasonable doubt as to whether he had the mental states required for a first degree murder conviction. The trial court deferred its ruling until trial.

7

After appellant testified at trial, respondent argued the trial court should exclude the expert psychological evidence because there was no evidence of a link between appellant's conduct on the day of the killing and the opinions offered by the defense experts. Appellant argued the expert testimony regarding his cognitive deficits was necessary to try to negate the mental states required for a first degree murder conviction, in the event the jury believed he was present at the time of the murder. Appellant also argued the expert testimony was necessary to help the jury evaluate the credibility of his testimony and his statements to the 911 dispatcher and the police.

The trial court excluded the evidence under Evidence Code section 352. The court reasoned that the evidence was not relevant because appellant's defense was that he was not present during the murder. The court also expressed concern that the expert testimony could confuse the jury about their role in assessing appellant's credibility and create a risk the jury would improperly be swayed by sympathy for appellant in their deliberations.

B. *Legal Background*

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) Relevant evidence is that which has a tendency "to prove or disprove a disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Under Evidence Code section 352, a court may exclude even relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The trial court's decision to admit or exclude evidence under Evidence Code section 352 is reviewed for abuse of discretion. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1008.) The court's determination will not be disturbed on appeal absent a showing the court exercised its discretion "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

Murder is the unlawful killing of a human being with malice aforethought; murder is of the first degree if it is willful, premeditated, and deliberate. (§§ 187, subd. (a), 189.)

8

"To prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." (§ 189.)

As appellant acknowledged below and acknowledges on appeal, under section 28[4] his proffered expert testimony was inadmissible to show he lacked the capacity to form the mental states to support his conviction for first degree murder. "The diminished capacity defense, which addressed an accused's 'general capacity or ability to form a specific intent or harbor a mental element of an offense,' was abolished in 1982." (*People v. Reyes* (1997) 52 Cal.App.4th 975, 982.) On the other hand, a defense of " 'diminished actuality' " is still available, under which "a defendant presents evidence of voluntary intoxication or mental condition to show he 'actually' lacked the mental states required for the crime." (*People v. Clark* (2011) 52 Cal.4th 856, 880, fn. 3.) In particular, a defendant may present evidence about a mental deficiency in order to negate a showing of malice, premeditation, and deliberation, as well as the knowledge and intent necessary for liability as an aider and abetter. (*People v. Saille* (1991) 54 Cal.3d 1103, 1117 [malice]; *People v. Padilla* (2002) 103 Cal.App.4th 675, 679 [premeditation and deliberation]; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1129, 1131 [voluntary intoxication may be relevant to aiding and abetting].)

In *People v. Coddington* (2000) 23 Cal.4th 529 (*Coddington*), overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13, the California Supreme Court addressed expert testimony regarding a defendant's mental

---

[4] Section 28, subdivision (a) provides, "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." Section 29 provides that any expert testifying about such mental deficiencies "shall not testify as to whether the defendant" actually had the required mental states for a charged offense, because that is a decision for the trier of fact.

9

disabilities as relevant to premeditation and deliberation. The Court explained, "Expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt phase of a trial. [Citation.] Sections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state. An expert's opinion that a form of mental illness can lead to impulsive behavior is relevant to the existence *vel non* of the mental states of premeditation and deliberation regardless of whether the expert believed appellant actually harbored those mental states at the time of the killing." (*Coddington*, at pp. 582–583, fn. omitted; accord *People v. Cortes* (2011) 192 Cal.App.4th 873, 902 (*Cortes*).)[5]

The *Cortes* court summarized the law as follows: "[S]ections 28 and 29 do not prevent the defendant from presenting expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time of the offense, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged." (*Cortes*, *supra*, 192 Cal.App.4th at pp. 908–909; see also *id*. at pp. 903-906 [summarizing cases].)

*Coddington* and the other cases cited by appellant do not, however, stand for the proposition that expert testimony regarding a defendant's mental deficits is *always* highly probative to the determination whether a defendant premeditated and deliberated, or other mental state determinations. In *Coddington*, the Supreme Court held any error by the

---

[5] *Coddington's* reference to the expert's belief as to whether the defendant actually harbored particular mental states was due to the challenged trial court ruling prohibiting the testimony at issue "unless the psychiatrist would testify, out of the presence of the jury, that he believed that [the defendant] did not premeditate and deliberate the killings." (*Coddington*, *supra*, 23 Cal.4th at p. 582.) There was no such ruling in the present case.

trial court in precluding certain questions was harmless because, despite the expert consensus the defendant was mentally ill, none of the experts "suggested that his illness precluded or would affect the ability to premeditate and deliberate." (*Coddington*, *supra*, 23 Cal.4th at p. 584.) Also, the evidence showed the crimes in the case were premeditated, regardless of the defendant's mental illness. (*Ibid.*) Thus, although evidence of a defendant's mental disabilities may be relevant, the degree of relevance depends on the particular nature of the mental deficits, the other evidence in the case, and the circumstances of the particular crime at issue.

C.     *Analysis*

In the present case, the trial court did not abuse its discretion in refusing to admit the expert testimony. At the outset, we reject appellant's assertion on appeal that the trial court "based its ruling solely on relevance." The court referred to Evidence Code section 352 several times and expressly identified its concerns regarding the undue prejudice and confusion that could result from admission of the expert testimony. (See *People v. Doolin* (2009) 45 Cal.4th 390, 438 [" 'a court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352' "].)

Appellant argues the proffered expert testimony was relevant to show that on the date of the homicide he "lacked the malice necessary for a conviction of murder, the premeditation and deliberation necessary for a conviction of first degree murder, or the specific intent necessary for aiding and abetting liability. Second, the expert testimony was relevant to the jury's understanding of the significance of appellant's incriminating statements to Ondina Palma, Mario Cajina, the 911 dispatcher, and police officers, insofar as it would have enlightened the jurors about how appellant's cognitive problems with perception, comprehension, memory, communication, and impulse control could lead him to inaccurately describe the events pertinent to the homicide. Third, the expert testimony was relevant to the jury's evaluation of the credibility of appellant's trial testimony, insofar as it would have educated the jurors about how appellant's cognitive

problems with perception, comprehension, memory, and communication could result in appellant's failure to recall and recount events in a logical manner." We disagree the proffered evidence had significant probative value on those issues.

### 1. *Relevance to Required Mental States*

As to the first asserted ground of relevance, appellant has failed to identify a scenario under which the proffered expert testimony would be relevant to determining his culpability.[6] As he appears to acknowledge, under the scenario he testified to at trial, the expert testimony was irrelevant because he claimed he was not present during the murder. Under that version of events, appellant was an accomplice after the fact, and he was not guilty of murder. The testimony was also irrelevant under the scenario described in the 911 call, in which appellant only witnessed the murder. The proffered testimony was irrelevant under the prosecution's theory that appellant and Morales lured the victim to the storage locker with the intent to kill. This is essentially the version related by Cajina, in which Morales told appellant they were going to kill Alba, they invited him to ditch school, and appellant held down Alba when he started to overpower Morales. Under that version of events, the evidence showed malice, premeditation, and deliberation, regardless of appellant's mental disabilities. Appellant points to nothing in the proffered expert testimony supporting an inference that he might not have understood that what he was planning or participating in was a murder. The prosecution was not required to show appellant "maturely and meaningfully reflected upon the gravity of his or her act." (§ 189.) The same reasoning applies to the scenario described to Ondina Palma, under which appellant planned and perpetrated the killing himself.

Appellant argues broadly that "based on Dr. Kline's testimony that a person with appellant's cognitive deficits could have impaired judgment in choosing social relations, difficulty extricating oneself from situations, vulnerability to being manipulated,

---

[6] We agree with appellant that he was entitled to rely on alternative defenses at trial. (See *People v. Elize* (1999) 71 Cal.App.4th 605, 615 [describing circumstances under which trial courts should provide instructions on alternate theories].) Thus, appellant could have properly argued below that he was not present during the murder, but if the jury found he was present, that he did not commit or aid and abet a premeditated killing.

impaired interpretation of social cues, difficulty learning new things, impaired comprehension of risks and consequences of behavior, immaturity in social interactions, concrete rather than abstract thinking, and impulsive decision-making [citation], the defense could have argued to the jury that appellant's participation in the homicide was most likely impulsive rather than premeditated and deliberate, and that appellant probably did not comprehend that the perpetrator intended to kill the victim at the time that appellant assisted the perpetrator in committing the deed." Although it is possible to imagine situations where such testimony might be relevant in determining a defendant's culpability for a murder, appellant fails to explain the relevance to the murder at issue in the present case. Essentially, appellant argues the expert testimony should have been put before the jury to allow the jury to infer that, if he participated in Alba's murder, it must have been impulsive or without a full understanding of the situation. However, absent an actual scenario under which that could have been so, any such inference would have been entirely speculative. " '[A]nd evidence which produces only *speculative* inferences is *irrelevant* evidence.' [Citation.]" (*People v. Babbitt* (1988) 45 Cal.3d 660, 682; accord *People v. Lewis* (2001) 26 Cal.4th 334, 373.)

The decision in *People v. Daniels* (2009) 176 Cal.App.4th 304 is instructive. In that case, the defendant was charged with kidnapping for rape; the victim had been intoxicated and had many gaps in her memory of the events. (*Id.* at pp. 307–309.) The defense sought to present expert testimony on alcoholic blackouts and alcohol's effects on memory. (*Id.* at p. 318.) *Daniels* upheld the trial court's decision to exclude this evidence under Evidence Code section 352. (*Id.* at pp. 321–323.) As relevant to the present case, *Daniels* viewed the proposed testimony as having minimal probative value because it was speculative: The defense's theory of relevance was that the victim might have agreed to accompany the defendant in his car but did not remember doing so because she might have been experiencing an alcoholic blackout, but there was no evidence either that she in fact experienced an alcoholic blackout or agreed to accompany the defendant. (*Id.* at p. 321; see also *People v. Cornwell* (2009) 37 Cal.4th 50, 81, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22

13

[trial court properly excluded expert testimony on theory of eyewitness identification where applicability of theory to case was speculative]; *People v. Mincey* (1992) 2 Cal.4th 408, 442 ["A defendant's rights to due process and to present a defense do not include a right to present to the jury a speculative, factually unfounded inference."].) In the present case, appellant's theory of relevance is that, under some unidentified circumstances not shown in the evidence at trial, appellant's participation in the murder might have been impulsive or uncomprehending. That theory is too speculative to establish relevance.

Because appellant has failed to identify a scenario supported by the evidence under which his mental disabilities would tend to disprove he acted with malice, premeditation, or deliberation, or had the knowledge and intent to support an aiding and abetting theory of liability, the trial court did not err in finding the proffered expert testimony had minimal or no probative value to the jury's determination of appellant's mental state.

### 2. *Relevance to Evaluation of Appellant's Out of Court Statements*

Appellant next contends the proffered expert testimony was relevant to the jury's evaluation of the significance of his statements to the 911 dispatcher, the police, Mario Cajina, and Ondina Palma. Appellant argues the expert testimony "would have enlightened the jurors about how appellant's cognitive problems with perception, comprehension, memory, communication, and impulse control could lead him to inaccurately implicate himself in the homicide."

We disagree. None of the proffered expert testimony cited by appellant suggested he would have trouble remembering the basic narrative of what occurred, such as whether a Black man in a bloody shirt stole his camera or whether he or Morales stabbed the victim. Appellant admitted he lied to the police and he necessarily lied in some of the conflicting statements made to the 911 dispatcher and the two acquaintances in Miami. Appellant's experts would have testified about appellant's reasoning problems and difficulty remembering details, but appellant points to no portion of their proffered testimony that would have accounted for the wildly different stories appellant told. Indeed, Dr. Perez admitted appellant's disabilities would not prevent him from

14

"accurately retrieving the gross details" of past events. Neither does appellant argue any of his experts would have testified he had a tendency to lie or take responsibility for crimes he did not commit.

*Crane v. Kentucky* (1986) 476 U.S. 683 (*Crane*) is inapposite. In that case, there was a "blanket exclusion of the proffered testimony about the circumstances of petitioner's confession," including "competent, reliable evidence bearing on the credibility of a confession"—to wit, evidence the defendant was "kept against his will in a small, windowless room for a protracted period of time until he confessed to every unsolved crime in the county." (*Id.* at pp. 690–691.) The case does not support the proposition that a defendant has a right to present any evidence purportedly relevant to the credibility of a confession, even where the circumstances of the case show the evidence lacks actual probative value. Appellant asserts the expert testimony would have answered the question posited in *Crane*, "If the defendant is innocent, why did he previously admit his guilt?" (*Id.* at p. 689.) But appellant fails to explain how testimony regarding his mental disabilities would have answered that question.

The other cases cited by appellant are also distinguishable. They all, like *Crane*, involve allegedly false confessions during police interrogations. In the present case, appellant lied instead of confessing to the police, and he told three other versions of the incident. None of the proffered expert testimony cited by appellant would have explained that behavior, and none of appellant's cases involve comparable claims. (See *State v. Oliver* (2005) 280 Kan. 681, 702 [124 P.3d 493, 508] [trial courts have discretion to admit expert testimony "bearing on [a defendant's] ability to respond reliably to interrogation," but trial court did not abuse its discretion in refusing to do so]; *Pritchett v. Commonwealth* (2002) 263 Va. 182, 183 [557 S.E.2d 205, 206] [error in excluding testimony regarding "susceptibility of mentally retarded persons to suggestive police interrogation"]; *State v. Buechler* (1998) 253 Neb. 727, 736 [572 N.W.2d 65, 71] [error in excluding expert testimony that suspect "in the throes of methamphetamine withdrawal" would have been "very suggestible" in police interrogation]; *People v. Hamilton* (1987) 163 Mich.App. 661, 664 [415 N.W.2d 653, 654] [error in excluding testimony regarding

15

defendant's tendency to lie as part of a " 'very rich fantasy life' " and "to say bad things about himself as a punishment"].)

The trial court did not err in concluding the proffered expert testimony had little to no probative value with respect to evaluating the credibility of appellant's out of court statements.

### 3. *Relevance to Evaluation of Appellant's Testimony*

Finally, appellant contends the proffered expert testimony was relevant to an evaluation of his trial testimony. Appellant argues the "experts would have educated the jurors about how appellant's cognitive problems with perception, comprehension, memory, and communication could cause his failure to recall and recount events in a logical manner."

In an appropriate case a trial court may admit expert testimony that helps the trier of fact evaluate a witness's testimony. Evidence Code section 780 provides that the trier of fact "may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including . . . (c) The extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies." In *People v. Stark* (1989) 213 Cal.App.3d 107, 112–114, the court relied on that statute in concluding the trial court, in a sex abuse case, did not err in admitting expert testimony regarding the victim's learning disability, where the disability affected the victim's ability to sequence events. (See also *State v. Gonzales* (1984) 140 Ariz. 349, 354 [681 P.2d 1368, 1373], overruled on another ground in *State v. Mott* (1997) 187 Ariz. 536 [931 P.2d 1046] [evidence "that substantiates the credibility of" a defendant who testifies in his defense is generally admissible].)

However, in the present case, appellant has not demonstrated the mental disabilities described by his experts were important in assessing his credibility. Appellant's credibility as a witness was undermined by the wildly disparate accounts he gave of the killing, including his lies to the police on several occasions and additional false out of court statements. Appellant has not demonstrated that the type of confusion regarding details that could be explained by the mental deficits identified by his experts

16

was important to an assessment of his credibility.[7]  Of course, it would be helpful for *any* witness's testimony to be buttressed by expert testimony tending to excuse any of the witness's apparent gaps in memory and reasoning.  In that sense, the proffered evidence might have had some relevance.  But, because appellant's credibility did not turn on such considerations, appellant has not shown the testimony was more than minimally probative on that point.

4.  *The Evidence Code Section 352 Balancing and Harmless Error*

As explained above, in the circumstances of the present case, the proffered expert testimony was not relevant to the jury's determination of whether appellant had the mental states required to support the charged offenses or to the jury's evaluation of appellant's out of court statements.  The expert testimony was only minimally probative to an assessment of the credibility of appellant's testimony, because that determination did not turn on the types of deficits in mental functioning identified by the experts.  On the other hand, the trial court properly considered under Evidence Code section 352 the possibility that the expert testimony would result in confusion.  The risk was particularly pronounced because the testimony would have consumed significant time, without there being any clear link between the identified mental deficits and the issues in the case.  The trial court also properly considered the risk that the expert testimony would improperly inject sympathy for appellant into the jury's deliberations.  (See *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1064 (*Sedillo*) ["photographs showing defendant with her child were unduly prejudicial because they tended to arouse sympathy for her as a mother"].)  Because the expert testimony was minimally probative at best, the trial court did not abuse its discretion in excluding it under Evidence Code section 352.

---

[7] Appellant asserts the prosecutor emphasized in his closing "flaws" in appellant's testimony relating to appellant's inability to "articulate" or "explain" various matters. We disagree.  The thrust of the prosecutor's attack on appellant's credibility was that appellant had lied to and misled the police and offered "various stories . . . to explain what happened that day."  The prosecutor also argued that appellant's testimony was "ludicrous" and "unbelievable" and that phone records showed that appellant was lying in certain aspects of his testimony.

Even if the trial court abused its discretion in excluding the testimony, it is not "reasonably probable the jury would have reached a result more favorable to" appellant had the evidence been admitted. (*People v. Alcala* (1992) 4 Cal.4th 742, 791.) Appellant lied to the police, fled out of state, admitted his involvement in the murder to two acquaintances in Miami, and attempted to escape upon his return to California.

Appellant contends any prejudice must be measured against the harmless beyond a reasonable doubt standard applicable to federal constitutional error. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) He contends the trial court's exclusion of his proffered expert testimony violated his constitutional due process right to present a complete defense. (*Crane v. Kentucky*, *supra*, 476 U.S. at pp. 690–691.) We disagree. Because the expert testimony was marginally probative at best, the trial court's rulings did not constitute "the complete exclusion of evidence intended to establish an accused's defense." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.) As explained in *Cornwell*, *supra*, 37 Cal.4th at p. 82, "A defendant has the general right to offer a defense through the testimony of his or her witnesses [citation], but a state court's application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon this right [citations]. The excluded evidence in the present case was not so vital to the defense that due process principles required its admission." (See also *Sedillo, supra,* 235 Cal.App.4th at pp. 1063–1064 [Evidence Code section 352 " 'must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to his or her defense' "].) In any event, the exclusion of the expert testimony was harmless even under the *Chapman* standard.

II.  *The Trial Court Did Not Err in Excluding Evidence of a Blade Found in a School Locker*

During trial, appellant sought to present testimony from a high school vice principal that four months before Alba's murder a sharpened blade wrapped in electrician's tape was found in the school locker of Darwin Gutierrez. Gutierrez was one of the teens who frequented the storage locker where Alba was killed. Morales was

18

questioned about the blade found in Gutierrez's locker, but Morales denied any knowledge of it. Appellant argued the testimony showed Gutierrez and Morales had a motive to keep any knife they possessed in the storage locker because they could not keep a knife at school or home. The trial court excluded the testimony pursuant to Evidence Code section 352. The court noted that any inference from the testimony would be speculative because "[t]here's no evidence to suggest because of [the disciplinary incident involving Gutierrez's blade] that either [Gutierrez or Morales] brought a knife to the storage locker where the alleged homicide occurred."

Appellant contends the trial court abused its discretion, arguing that the testimony would have shown "that Morales and Gutierrez had a motive, which predated the day of the homicide, to keep any knives that belonged to them at the storage locker. The excluded evidence would have allowed the defense to argue to the jury that the stabbing may have been a spontaneous act during a struggle between the stabber and the victim, rather than a preplanned fatal assault. This inference was important to the defense effort to raise a reasonable doubt as to the proof of the mental states of premeditation and deliberation and intent to kill required for a conviction of first degree murder."

We reject appellant's claim. As noted previously, a defendant has no "right to present to the jury a speculative, factually unfounded inference." (*People v. Mincey*, *supra*, 2 Cal.4th at p. 442.) Appellant points to no evidence appellant and Morales could not have kept any knives they possessed at home. Contrary to appellant's assertion on appeal, the fact that a friend of Morales got in trouble because he had a sharpened blade in his school locker does not tend to prove that Morales or another person kept a knife in the storage locker. (Evid. Code, § 210.) The trial court did not abuse its discretion in excluding the vice principal's testimony. Even if the trial court erred, the testimony was so minimally probative that its exclusion was not prejudicial.

## DISPOSITION

The trial court's judgment is affirmed.

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

NEEDHAM, J.